*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
KISOR, MIZER, and HARRELL
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Roneshia L. REDMOND**
Damage Controlman First Class Petty Officer (E-6), U.S. Navy
*Appellant*

**No. 202300130**

_____

Decided: 6 August 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Justin R. McEwen

Sentence adjudged 1 March 2023 by a special court-martial tried at U.S. Naval Support Activity Souda Bay, Greece, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-5 and forfeiture of $1,000.00 pay per month for three months.

For Appellant:
*Lieutenant Zoe R. Danielczyk, JAGC, USN*

For Appellee:
*Lieutenant Michael A. Tuosto, JAGC, USN*

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

PER CURIAM:

Appellant was convicted, contrary to her pleas, of one specification of willful disobedience of a petty officer in violation of Article 91, Uniform Code of Military Justice (UCMJ).[1] Appellant filed a timely appeal pursuant to Article 66(b)(1)(A),[2] asserting one assignment of error (AOE): whether the evidence is factually insufficient to support Appellant's conviction of willful disobedience of a petty officer.[3] We find no prejudicial error and affirm.

## I. BACKGROUND

An ordinary shift for security personnel at Entry Control Point (ECP) India, U.S. Naval Support Activity Souda Bay, Greece, became less so for a moment when Appellant pulled up in her car with two passengers in the early morning hours of 10 December 2022.

When Appellant stopped behind the drop arm barrier at the ECP, Master-at-Arms Petty Officer Second Class (MA2) Victor[4] approached Appellant from the guard shack, accepted Appellant's identification card, and noticed Appellant to have an odor of alcohol, slurred speech, and glossy eyes. Since Appellant sought entry through the ECP during the daily 0000–0500 command authorized sobriety checkpoint, MA2 Victor advised Appellant of the requirement to blow into an Alco-Blow alcohol detection device. Appellant had no interest in that and refused. Master-at-Arms Petty Officer First Class (MA1) Bravo, the watch commander who happened to be at the ECP for a post check, reiterated

_____

[1] 10 U.S.C. § 891.

[2] 10 U.S.C. § 866(b)(1)(A).

[3] Appellant raised this issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

the requirement to Appellant, and Appellant reiterated her refusal. Instead, she reversed her car away from the ECP against the orders of MA2 Victor and MA1 Bravo, dropped off her passengers, and drove away. A third Sailor at the ECP, Master-at-Arms Petty Officer Third Class (MA3) Foxtrot, observed part of the encounter from the guard shack, and the three testified about the minute-long run-in at Appellant's court-martial for failing to obey a base order by refusing to submit to a breath analysis in violation of Article 92, UCMJ, and willfully disobeying MA2 Victor's order to not drive away from the ECP in violation of Article 91, UCMJ.[5]

MA2 Victor testified in relevant part as follows:

> Q: When [Appellant] pulled up, what, if anything, did you notice about her?
>
> A: I can smell like alcohol on her breath. When I started talking to her, she was slurring her words a little bit, and her eyes were glossy. Other than that, she handed me her [identification card] like a normal person would have.
>
> Q: What did you do when she handed you her identification?
>
> A: I told her that we were going to do the Alco-Blow. I explained it to her a little bit because I had to grab her ID to hand it to my cover sentry, and I was also looking at the passenger's IDs as well.
>
> Q: So, you said that you told her about the Alco-Blow. What is it that you told her?
>
> A: I explained to her the reason why I was taking the ID was because we had to write it down for inspection and that I had to perform an Alco-Blow on her.
>
> . . . .
>
> Q: After you informed [Appellant] that you needed to perform an Alco-Blow test, what is it that she said to you?

---

[5] The Government also charged Appellant with willfully disobeying an order of MA2 Victor to submit to a breath analysis, but the military judge dismissed the specification before trial.

A: She was saying, "No, no, no. You don't have to do that," because I was handing the ID to [MA3 Foxtrot]. She said, "No. It's okay."

. . . .

Q: [W]hat, if anything, did you explain to [Appellant] to get her to comply?

A: So, I turned back around, and I told her that it's a command authorized breathalyzer or Alco-Blow, that everybody has to do it coming onto base in these hours, and I explained to her the process of a breathalyzer, that it had to be a steady blow into it, until it beeps.

Q: How did [Appellant] respond to you after you explained that?

A: She was just basically saying, "No, I'm not doing that. I'm just here to drop these people off."

. . . .

Q: How did the interaction ultimately end with [Appellant]?

A: She told us that she was just going to reverse back, and we told her no, and then she continued on with the reversing back, and she basically did a U-turn right in front before India Post, and she turned around, dropped off the personnel that was in the car at the stop sign right there, leaving, and then she left.

Q: Did anyone give her permission to reverse?

A: No. We told her that she wasn't allowed to do that.

Q: What was your volume when you were communicating to [Appellant] about not reversing?

A: It was loud enough for her to hear. I did increase my volume because she was reversing and going further away, but it was--it was loud enough for her to hear.

. . . .

Q: [W]as there any obstruction to her reversing at that time?

A: There was another vehicle at the stop sign waiting to come through the gate.

. . . .

> Q: After you told [Appellant] not to reverse, how did she react?
>
> A: She just continued to reverse, and she said, "No, no, no. I'm not doing that."[6]

MA2 Victor later narrated a video (sans audio) of the encounter introduced into evidence. She testified:

> Q: So, what was it that [Appellant] was saying there as she pointed behind her and looked behind her?
>
> A: She said, "I'm just going to reverse back right here."
>
> Q: And what was it that she--how did you respond?
>
> A: We told her, no, she couldn't do that.[7]

The Government then called MA1 Bravo. After recounting the conversation about the Alco-Blow, she testified:

> Q: [H]ow did the interaction that night end?
>
> A: So, after that happened, I said, "Okay. You don't have to do it. Denying it is also your right, but I'm going to keep your ID, and I need to make notifications."
>
> Q: How did [Appellant] respond when you said that you needed to make notifications?
>
> A: She stated, "I'm good. Y'all can keep the ID. I'm leaving."
>
> Q: Had anyone given [Appellant] permission to reverse?
>
> A: No.
>
> Q: Did anyone explain to [Appellant] that she could not reverse?
>
> A: Yes.
>
> Q: What--who said something?
>
> A: I said, "How are you leaving? There's a vehicle behind you, and you can't leave."

---

[6] R. at 190–94.

[7] R. at 201.

> Q: How did [Appellant] respond?
>
> A: She reversed. She--she started to reverse slowly, and [MA2 Victor] told her, "You can't leave," and then she just reversed.
>
> Q: After you told--after [MA2 Victor] told [Appellant] not to reverse, did [Appellant] make any response?
>
> A: I didn't hear a response.
>
> Q: At any point do you recall [Appellant] stating, "This is me leaving"?
>
> A: Yes.
>
> Q: Could you describe in what context she said that?
>
> A: After--it was between when I told her and I--I told her she couldn't leave and when [MA2 Victor] told her she couldn't leave.[8]

MA3 Foxtrot rounded out the matter:

> Q: So, you just mentioned that you heard [Appellant] say, "This is me leaving now." Did [MA2 Victor] give any order to [Appellant] about reversing?
>
> A: She said, "Stop. You can't do that." And then her and [MA1 Bravo] as well, once [MA2 Victor] stopped talking, [MA1 Bravo] took more of the reigns [sic]. She was the higher ranking personnel, and, you know, she was kind of helping us out because we didn't know what to do in a sense where someone just turned from India Gate back.[9]

The military judge acquitted Appellant of failing to obey the base order by refusing to submit to a breath analysis, and he convicted her of willfully disobeying MA2 Victor's order to not drive away from the ECP. He entered special findings upon the Defense's request, writing in relevant part:

> On this is of [sic] order to not drive away from the ECP, the court relied on the following evidence: (1) [MA2 Victor] testimony that when the accused said she was backing up from the ECP, [MA1

---

[8] R. at 252–54.

[9] R. at 346.

Bravo] said, "no you cannot do that." This is circumstantial evidence establishing that the accused was on notice that she cannot leave the ECP; (2) [MA1 Bravo], [MA3 Foxtrot], and [MA2 Victor's] testimony that when the Accused began to reverse and stated that "this is me backing up", [MA2 Victor] stated "no you can't do that." This is direct evidence that [MA2 Victor] ordered the accused to not back up and leave the ECP; (3) The testimony of [MA1 Bravo], [MA2 Victor], and [MA3 Foxtrot] that when the accused was backing up from India Gate, she was leaving the ECP; and, (4) The video evidence showing the accused backing up from the ECP.[10]

This "timely appeal from the judgment of a court-martial . . . that includes a finding of guilty" followed.[11] Additional facts necessary to resolve the AOE are discussed below.

## II. DISCUSSION

### A. Law

Article 66(d)(1)(B), Factual Sufficiency Review, provides:

> (i) In an appeal of a finding of guilty . . . the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.
>
> (ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—
>
>> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and
>>
>> (II) appropriate deference to findings of fact entered into the record by the military judge.
>
> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against

---

[10] Appellate Ex. XVII at 2–3.

[11] 10 U.S.C. § 866(b)(1)(A).

the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.[12]

Accordingly, "to trigger factual sufficiency review under the present Article 66(d)(1)(B), Congress requires two circumstances be present: (1) a request of the accused; and (2) a specific showing of a deficiency in proof."[13] To make a specific showing of a deficiency in proof, "an appellant must identify a weakness in the evidence admitted at trial to support an element (or more than one element) and explain why, on balance, the evidence (or lack thereof) admitted at trial contradicts a guilty finding."[14] Then, "this Court will weigh the evidence in a deferential manner to the result at trial. If we are clearly convinced that, when weighed, the evidence (including the testimony) does not support a conviction, we may set it aside."[15]

**B. Analysis**

The Government charged Appellant as follows:

> In that Damage Controlman First Class Roneshia Redmond, U.S. Navy, U.S. Naval Support Activity Souda Bay, Greece, on active duty, having received a lawful order from [MA2 Victor], U.S. Navy, a petty officer, then known by the accused to be a petty officer, to not drive away from the Entry Control Point, an order which it was her duty to obey, did, at or near Souda Bay, Greece, on or about 10 December 2022, willfully disobey the same.[16]

The elements of this offense are:

(1) That Appellant was an enlisted member;

(2) That Appellant received a lawful order from MA2 Victor, a petty officer, to not drive away from the Entry Control Point;

(3) That Appellant then knew that MA2 Victor was a petty officer;

(4) That Appellant had a duty to obey the order; and

---

[12] 10 U.S.C. § 866(d)(1)(B).

[13] *United States v. Harvey*, 83 M.J. 685, 691 (N-M Ct. Crim. App. 2023), *rev. granted*, __ M.J. __, No. 23-0239/NA, 2024 CAAF LEXIS 13 (C.A.A.F. Jan. 10, 2024).

[14] *Id.*

[15] *Id.* at 693.

[16] Charge Sheet.

(5) That, on or about 10 December 2022, at or near Souda Bay,
Greece, Appellant willfully disobeyed the order.

Appellant focuses on the second element, arguing that the Government
failed to prove that MA2 Victor actually issued an order to Appellant. She could
not have disobeyed an order that was not given, the argument logically contin-
ues, attacking the fifth element by extension. So was that order given? The
three Masters-at-Arms testified as much, the military judge found as much,
and we give appropriate deference to such.

Appellant identifies a handful of perceived weaknesses in the evidence ad-
mitted at trial. First, Appellant highlights points scored on cross-examination
of MA2 Victor, particularly her concession that "her testimony on direct exam-
ination was not a 'word for word' account of what she told Appellant on the
night in question."[17] This is apparently premised on the following exchange
during cross-examination:

> Q: You went through the video, and you remembered word
> for word what happened pretty specifically?
>
> A: No, not word for word, but I do remember the basis of
> what I was trying to--or what I was telling her.
>
> Q: So, the testimony you gave while the Prosecution
> played the video was not an exact word-for-word----
>
> A: I can't say if----
>
> Q: ----of what happened?
>
> A: I can't say if it was word for word or not, sir. This did
> happen a while ago. So, I don't want to say this is ex-
> actly what I said. But, based off what I said was the--
> the basis of what I was telling her that night.
>
> Q: So, in the beginning, we've talked about the importance
> of exactly what you said and did?
>
> A: Yes.
>
> Q: Your testimony today is that you're not sure if that was
> word-for-word what she said while they were playing
> the video?
>
> . . . .

---

[17] Appellant's Br. at 15–16.

A: I know what I said, but I can't say it was word for word exactly the words I used that same night.

Q: You're giving your best guess at what you said----

A: I wouldn't--

Q: ----specifically word for word?

A: I wouldn't say it was a guess. I do know what I said that night, but I don't want to input words that I did say or input words I didn't say, in case I get the word wrong.[18]

Suitable cross-examination there, but not enough to sway either the fact-finder or us. MA2 Victor reasonably conceded the possibility of an imperfect memory of the precise words she uttered a few months before, but she maintained the thrust of it all—an order to not drive away from the ECP—which was corroborated by two witnesses within earshot.

Appellant also makes much of MA2 Victor admitting on cross-examination that her pretrial statement that she stepped towards Appellant's car as she ordered Appellant not to reverse was untrue. True, a video admitted into evidence evinces no step toward Appellant's car as it reversed, but MA2 Victor's immobility in that moment bears no load other than perhaps whether Appellant could hear—and thus willfully disobey—MA2 Victor's order to not drive away from the ECP. To that point, MA2 Victor testified on direct-examination and maintained on cross-examination that she increased the volume of her voice when issuing the order. She also testified that there were no interfering noises. MA3 Foxtrot agreed, testifying that MA2 Victor was "authoritative" and used a "raised voice."[19] And whatever hit to MA2 Victor's credibility this impeachment caused was evidently not compelling in the view of the military judge, who heard and saw this and the other witnesses. We give appropriate deference to that, and we do not disagree.

Appellant also highlights that MA1 Bravo's detailed, close-in-time description of this incident in the desk journal, a record maintained by the Security Department, contains no reference to an order from MA2 Victor to Appellant not to drive away from the ECP. If this order had been given, argues Appellant, it would have been recorded in the desk journal. *Log it or it didn't happen* is perhaps a helpful mantra for watch and duty standers, but it is unavailing here. To be sure, the absence of a written record of a matter may be probative

---

[18] R. at 219–20.

[19] R. at 362.

in some instances,[20] but against the backdrop of the testimony of the three percipient witnesses, that absence here it is not fatal to the Government's case.

Though Appellant satisfactorily raises specific deficiencies in proof, triggering our factual sufficiency review, we have weighed the evidence and are not clearly convinced that the finding of guilty was against the weight of the evidence.[21]

---

[20] *Cf*. Mil. R. Evid. 803(7).

[21] Though we, as Appellant, focus primarily herein on whether MA2 Victor issued an order to Appellant, we have assessed each element of the offense and the evidence thereof introduced at trial, and we conclude that the finding of guilty is both factually and legally sufficient.

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[22]

However, we note that the Entry of Judgment is deficient in two respects. First, it does not adequately summarize each specification referred to trial as required by Rule for Courts-Martial 1111(b)(1)(A) and our published opinion in *United States v. Wadaa.*[23] Second, it does not reflect the disposition of the charges referred to trial, but only that of the specifications. Although we find no prejudice, Appellant is entitled to have court-martial records that correctly reflect the content of his proceeding.[24] In accordance with Rule for Courts-Martial 1111(c)(2), we modify the Entry of Judgment and direct that it be included in the record.

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[22] 10 U.S.C. §§ 859, 866.

[23] __ M.J. ___ No. 202300273, 2024 CCA LEXIS 148 at *6 (N-M Ct. Crim. App. Apr. 25, 2024).

[24] *United States v. Sutton*, 81 M.J. 677 (N-M. Ct. Crim. App. 2021); *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).

# United States Navy–Marine Corps
# Court of Criminal Appeals

| | |
|---|---|
| **UNITED STATES** | **NMCCA NO. 202300130** |
| **v.** | **ENTRY OF JUDGMENT** |
| **Roneshia L. REDMOND**<br>**Damage Controlman First Class**<br>**Petty Officer (E-6)**<br>**U.S. Navy** | |
| | ***As Modified on Appeal*** |
| ***Accused*** | **6 August 2024** |

On 27 February–1 March 2023, the Accused was tried at U.S. Naval Support Activity Souda Bay, Greece, by special court-martial consisting of a military judge sitting alone. Military Judge Justin R. McEwen presided.

## FINDINGS

The following are the Accused's pleas and the Court's finding to all offenses the convening authority referred to trial:

**Charge I:** **Violation of Article 91, Uniform Code of Military Justice, 10 U.S.C. § 891.**

> *Plea:* Not Guilty.
> *Finding:* Guilty.

**Specification 1:** **Willfully disobeying the lawful order of a petty officer to submit to a breath analysis on or about 10 December 2022.**

> *Plea:* Not Guilty.
> *Finding:* Dismissed without prejudice.

**Specification 2:** **Willfully disobeying the lawful order of a petty officer to not drive away from the Entry Control Point on or about 10 December 2022.**

> *Plea:* Not Guilty.
> *Finding:* Guilty.

**Charge II:**   **Violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892.**

> *Plea:* Not Guilty.
>
> *Finding:* Not Guilty.

**Specification:**   **Failure to obey other lawful order, NAVSUPPACTSOUDABAYINST 5560.2, by refusing to submit to a breath analysis on or about 10 December 2022.**

> *Plea:* Not Guilty.
>
> *Finding:* Not Guilty.

## SENTENCE

On 1 March 2023, the military judge sentenced the Accused to the following:

**Reduction to pay grade E-5.**

**Forfeiture of $1,000 pay per month for three months.**

FOR THE COURT:

MARK K. JAMISON
Clerk of Court